

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 29, 2021

**By ECF**

The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

    Re:   *United States v. Elizabeth Achan*, 20 CR 87 (LTS)

Dear Judge Swain,

    The Government respectfully submits this letter in advance of the defendant's sentencing, currently scheduled to proceed by videoconference on February 9, 2021 at 10:00 AM. For the reasons set out below, the Government submits that a sentence within the range of 33 to 41 months, which is the applicable range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, in particular here, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and particularly given the circumstances of the instant offense and the defendant's prior commission of much the same crime, albeit on a lesser scale, to afford adequate deterrence to criminal conduct.

## CARES Act

    As an initial matter, the Government respectfully submits that prior to imposing sentence under Federal Rule of Criminal Procedure 32 by videoconference, pursuant to Section 15002(b)(2)(A) of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), the Court must "find[ ] for specific reasons that the . . . sentencing . . . cannot be further delayed without serious harm to the interests of justice." In this case, the Government views the defendant's request that the Court impose sentence at this time in order to be represented by her current appointed counsel at sentencing as constituting sufficient "specific reasons" under the statute during the ongoing national emergency that underlies the CARES Act.

## Background

    On October 30, 2019, the defendant was arrested and presented on a complaint charging her with two counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A, arising from her perpetration of two separate

schemes to defraud her employer and her then prior and current coworkers of almost $600,000 between 2015 and 2018.  (*See* Compl. at 1-6.)  Thereafter, on January 31, 2020, the defendant waived indictment and was arraigned on an information, which leveled the same charges against her.  (*See* Information at 1-3.)  Finally, pursuant to a plea agreement with the Government, on October 14, 2020, the defendant was permitted to plead guilty only to the information's first two counts of wire fraud. (Presentence Investigation Report ("PSR") at ¶ 6.)  In terms of the instant offense conduct, the Government generally relies upon the description of the offense conduct set out in the PSR, which substantially mirrors the allegations brought against the defendant in the underlying complaint and to which the defendant previously registered no objection.  (*See id.* at 5-7.)  To the extent that the Court is not prepared to adopt this recitation of facts in its entirety and in particular the description of how the defendant for multiple years manually blocked payments into the retirement accounts of her coworkers every pay period in order to steal their retirement savings for herself, egregious and repeated conduct which the defendant now attempts to dispute in her sentencing submission (*see* Def.'s Ltr. at 8), the Government respectfully requests a hearing to resolve any dispute on this material point that remains at the time of sentencing.

As stated above, the victims of the defendant's fraud are her prior employer and her then prior and current coworkers at her prior employer ("Business-1").  Business-1, which is based in the Bronx, is a privately owned company whose principals are largely members of multiple generations of the same family, which acquired its ownership interest in Business-1 in approximately 1970.  In or about December 2014, the defendant began to work at Business-1 where she was employed as a payroll coordinator for approximately four years, almost all but the first six months of which she stole substantial amounts of money from Business-1 during each pay period.  At the beginning of the defendant's career, Business-1 employed approximately fifteen employees.  At the end of the defendant's career—which came to a close in or about December 2018 when, realizing that she had finally been caught, the defendant simply stopped coming to work—Business-1 employed approximately thirty employees.  When the extent of the defendant's theft from the retirement accounts of her coworkers was thereafter identified through months of forensic accounting work focused on unraveling her crime, Business-1 made all of its employees whole, spending hundreds of thousands of dollars to do so, which largely wiped out the equity that the owning family and overall ownership of Business-1 had steadily accumulated over the preceding decades.  In addition, earlier in the process of triaging the harm wrought by the defendant who left behind no explanation for her crime, let alone offer of assistance to mitigate its damage,[1] the principals of Business-1 worked frantically to ensure that there was no break in the insurance

---

[1] The Government notes that the defendant suggests for the first time that she committed the instant offense because she was underpaid for her work and also the victim of sexual harassment by the principals of Business-1, claims that are wholly uncorroborated and self-serving.  (*See* Def.'s Ltr. at 7-8.)  Regardless of whether the allegations are intended to excuse her own conduct by recasting it in retrospect as somehow justified or are intended merely to cause further pain to her victims, they demonstrate, in any event, a remarkable lack of awareness and contrition from the defendant. It is extraordinary, for example, for the defendant to lament to the Court in the context of her own sentencing the purported "exploitation of other employees—women who were treated in an abusive fashion, workers who were underpaid for their labor" by the principals of Business-1 when she is the one who stole literally hundreds of thousands of dollars from the retirement accounts of those same employees.  (*Id.* at 8.)

coverage of any of their employees whose health care and dental care was in multiple cases at risk of lapsing because the defendant began to divert through the payroll system certain funds that were destined to pay for such benefits, redirecting them to the retirement accounts of these same employees in a belated effort to avoid the detection of her second fraudulent scheme.

## **Applicable Law**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs::

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines

sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## Sentence

Here, a sentence within the range of 33 to 41 months—which is the applicable range pursuant to the Guidelines calculated in the defendant's plea agreement and in the PSR without objection from the defendant—would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

To be sure the Government notes at the outset its respectful but strong disagreement with the recommendation of Probation that the defendant not serve a custodial sentence. In fairness, this disagreement arises in some substantial part based on information that the Government has only recently obtained following the finalization of the Presentence Investigation Report concerning the defendant's criminal history, which is detailed below in the context of addressing the particular need in this case for the sentence to achieve specific and general deterrence. With that said, the Government also does fundamentally disagree with the conclusion of Probation that a non-custodial sentence would address the interrelated objectives of reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment. Having already been convicted of a felony, already been subject in substantial part to the same practical restrictions on her movement away from her home as the rest of our society amidst the ongoing pandemic for the past year and for the foreseeable future, and without any substantial assets or current prospects of legitimate future earnings sufficient to pay any fine or ever begin to make whole her defrauded employer, the defendant, if sentenced to a non-custodial sentence, will have faced no material consequence whatsoever for her crimes, which particularly given her recidivism fails to reflect the seriousness of her offense, invites contempt as opposed to respect for the law, and fails to punish her in any meaningful way.

In making its recommendation here, the Government is not blind to the circumstances of the defendant's upbringing and adult life on which the defendant focuses in her sentencing submission, and the Government, like the Court, feels very substantial sympathy for these circumstances, including the recent death in her family, which occurred after her arrest. Nonetheless, the Government does not view these circumstances individually or collectively as a proximate cause for the defendant having embezzled more than one half of a million dollars over four years, all of which apparently she succeeded in dissipating by the time of her arrest less than one year after her crime was detected given her current financial status. (*See* PSR at ¶¶ 75-77.)

Of far greater focus for the Government and no doubt also the Court is the defendant's status at present as the sole provider and caregiver for her two children who are in elementary and high school. What is a just sentence for society obviously incorporates and must be influenced by what is a just sentence for these children. This consideration should obviously heavily impact what is an appropriate sentence within the Guidelines range. And indeed, although the Government believes that a sentence within that range is appropriate, the Government also acknowledges that a downward variance of some number of months below that range out of consideration for the defendant's two children would not result in a necessarily unjust sentence let alone one that would offend on its face the purposes of sentencing. With all of that said, however,

the presence of multiple, employed, adult siblings of the defendant both in the City of New York and within close proximity to its metropolitan area are a material consideration here that impacts the Government's view that a substantial custodial sentence is still both appropriate and necessary. It is the case that the capacity of the defendant's siblings to provide support for the defendant and her children, which the Government witnessed at the time of her arrest and presentment when her family offered firm and vocal support of the defendant, is real and significantly differentiates this case from others in which a defendant responsible for minor children lacks such a substantial base of familial support to step in for those children during any period of a custodial sentence. (*See* PSR at ¶ 57.) And although the defendant's mother who already lives in the same residence with the defendant and her children currently doubts her ability to provide for those children alone, this same capacity of the defendant's siblings to provide support for the defendant and her children can buttress whatever care the defendant's mother is able to muster within the existing family residence and further mitigates the harm to the defendant's children that will result to at least some degree from her incarceration, which the Government acknowledges of course presents a stark tradeoff that the Court must very carefully weigh in imposing the sentence in this case. (*See id.* at ¶ 63.) Finally, on this last point, the Government respectfully submits that it is also relevant that the defendant not only currently resides with her children and her mother, albeit on different floors, in a single family residence, but also that the title to that residence appears to remain within her family, with the defendant's reported rent presumably being paid to her mother or some other family member.

In addressing explicitly the other side of this same stark tradeoff, the factors that weigh substantially in favor of a custodial sentence, the Government respectfully submits that the Court must consider the nature of the defendant's instant offense, which was egregious and particularly blameworthy in several important respects. First, the extent of the defendant's fraud—more than one half of a million dollars over four years—simply puts the lie to her assertions that she was driven to commit the instant offense out of desperation and want. (*See* Def.'s Ltr. at Ex. A.) There are literally millions of residents in the City of New York who succeed in leading law-abiding lives and providing for their families without stealing an average of $150,000 a year over four consecutive years. Second, the defendant's fraud did not result from a single lapse in judgment or moment of cruelty or even a tight constellation of such bad conduct attributable to a common proximate cause. To the contrary, every pay period between in or about July 2015 and March 2017, the defendant caused a payment to be issued to one of her retired coworkers, each of which the defendant stole, totaling approximately $167,000, the tax liability for which the defendant repeatedly placed on that retired coworker without any care for the consequences. And after that scheme was disrupted, the defendant refrained from defrauding her employer for all of approximately three months before she again started stealing every pay period from the retirement accounts of her current coworkers, week after week after week. Third, although the ultimate financial loss fell upon her employer as a result of the willingness of its principals to shield their employees from the defendant's fraud, it heightens the defendant's culpability that she was prepared to literally steal from coworkers whom she saw on a daily basis and who, in an effort to save herself, she was prepared to strip of the insurance coverage that protected them and their families. Finally, not until now, when she is facing the prospect of real consequences for her crimes, has the defendant conveyed any apology or offer of assistance to her victims whom she literally walked away from and left to figure out at great expense over months exactly the nature of the harm that she had caused to them.

A Guidelines sentence would also be sufficient, but not greater than necessary, to afford adequate deterrence to criminal conduct. And here is where the defendant's history and characteristics, in particular her criminal history, should weigh heavily in favor of imposing a substantial custodial sentence. As the Presentence Investigation Report notes, the defendant was previously sentenced in or about March 2005 to a sentence of five years' probation following her conviction of Grand Larceny in the Third Degree, in violation of New York Penal Law § 155.35. The Government has now learned from the New Castle Police Department the following information concerning the conduct underlying that conviction. Namely, between in or about September 2001 and October 2003, the defendant was employed as a bookkeeper and office manager in a small privately-owned company in Chappaqua, New York, which is referenced in the Presentence Investigation Report. (*See* PSR at ¶ 73.) As the bookkeeper and office manager, a role not dissimilar to the position that she exploited here in committing the instant offense, the defendant was entrusted by the single principal of this business with a credit card to use for business expenses. The defendant was also authorized to write checks from the check book of the company for such expenses. In or about October 2003, the principal realized that the defendant had been steadily over the course of the prior two years, effectively since she started as an employee at the company, stealing thousands of dollars through unauthorized use of the credit card and issuance of checks, which totaled approximately $51,000. When confronted by the principal, who fired the defendant, the defendant expressed her contrition and pleaded for an opportunity to pay back the company over time, which she never did, never even returning a single dollar of the stolen funds before she was arrested in or about March 2004.

Thus the instant offense, itself the product of many acts of deceit and theft committed again and again over multiple years, is itself, even when considered in its totality, simply a return to a kind of deceit and theft that the defendant first committed in remarkably similar circumstances, albeit on a different order of magnitude, over ten years earlier. The defendant is a recidivist and sentencing her in principal to the same sentence that she received previously for less egregious conduct causing less extensive harm (*i.e.*, five years' probation) will fail to specifically deter her from committing this same kind of crime again and moreover fail to generally deter similarly-situated white-collar criminals who are also inclined to use their professional skills once more to perpetrate frauds against their employers and fellow employees and doubt that there will be any meaningful consequence.

## **Conclusion**

For the reasons set out above, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment within the range of 33 to 41 months, which is the applicable range pursuant to the Guidelines, impose a term of supervised release of three years,

and order forfeiture and restitution, both in the amount of $595,994.14, for which the Government will supply proposed orders in advance of sentencing.

> Respectfully,
>
> AUDREY STRAUSS
> United States Attorney
>
> By: *Thomas John Wright*
> Thomas John Wright
> Assistant United States Attorney
> (212) 637-2295

cc: Ariel Werner (Federal Defenders of New York, Inc.) (by ECF)